### DETERMINED IN THE

# COURT OF ERRORS AND APPEALS

### OF THE

## STATE OF NEW JERSEY,

### JUNE TERM, 1902.

ROBERT G. SMITH, DEFENDANT IN ERROR, v. P. FARMER
WANSER, MAJOR–GENERAL, AND ALEXANDER C. OLI-
PHANT, ADJUTANT–GENERAL, PLAINTIFFS IN ERROR.

Argued March 25, 1902—Decided May 2, 1902.

1. A field officer of a brigade of militia, entitled to take part in the
   election of a brigadier-general under the provisions of placitum 4,
   section 1 of article 7 of the constitution, may prosecute a *certiorari*
   to review the military order calling for such an election and in-
   cluding as persons entitled to vote thereat officers who were not
   field officers.
2. The act entitled "An act concerning the military and naval forces"
   [Revision of 1900] was not intended to create, and has not created,
   a military force separate from the militia and not subject to the
   provisions of the constitution; on the contrary, it was intended to
   regulate the militia, and the constitutional provisions respecting
   the militia are applicable to it.
3. The constitution having expressly declared that brigadier-generals
   shall be elected by the field officers of the brigade, the legislature
   had no power to enact that other persons should be entitled to
   vote at such election of brigadier-generals.

4. If the legislature intended, by the act of 1900, to create a state military force not militia, the act would be invalid, because of the provision of the constitution of the United States "that no state shall, without the consent of congress, * * * keep troops * * * in time of peace."

On error to the Supreme Court.

This writ of error brings up for review a judgment of the Supreme Court vacating and setting aside an order of P. Farmer Wanser, major-general commanding division, national guard of New Jersey, which order was in the following words, viz.:

"HEADQUARTERS DIVISION,
"NATIONAL GUARD OF NEW JERSEY.
"CAMDEN, February 18th, 1902.
"Special Orders,
"No. 3.

"The field officers of the 1st Brigade and the commanding officers of Battery A, field artillery, and the 1st Troop Cavalry, will assemble at the headquarters room, in the 1st Regiment Armory, Newark, on Friday, February 28th, 1902, at 8.30 o'clock P. M., for the purpose of electing a Brigadier-General of 1st Brigade.

"Officers will appear in undress uniform, without sidearms.

"By command of Major-General Wanser.

"THOMAS S. CHAMBERS,
"*Assistant Adjutant-General.*"

The order had been returned into the Supreme Court by Alexander C. Oliphant, the adjutant-general of New Jersey, in response to a *certiorari* allowed by that court, and directed to Wanser, the maker of the order, and Oliphant, the adjutant-general, who had the custody thereof.

For the plaintiffs in error, *George E. P. Howard* and *James P. Northrop.*

For the defendant in error, *Charles W. Parker.*

The opinion of the court was delivered by

MAGIE, CHANCELLOR. Plaintiffs in error seek a reversal of the judgment under review, on two grounds, viz.:

*First.* That the Supreme Court had no power to review, by *certiorari,* a military order such as that which is brought in question; and

*Second.* That if that court could thus review the order, it erred in vacating it and setting it aside.

With respect to the first point, the reported decisions of the Supreme Court indicate that that court has asserted and exercised, from a very early period, the power to review the adjudication of courts-martial and of company courts in the military establishment, when such adjudications affect the person and property of a citizen. *State* v. *Chambers, Coxe* *400; *State* v. *Davis,* 1 *South.* *311; *State* v. *Kirby,* 1 *Halst.* 143; *State* v. *Atkinson,* 4 *Id.* 271.

On the other hand, the Supreme Court has determined that it has no jurisdiction to review an order made by a division commander disbanding a company, whereby privates lost their military *status* and the company officers were placed upon the retired list. The legislation then applicable conferred express power upon the major-general to make such an order with such results. The case showed that the order complained of was made solely upon a communication from the colonel of the regiment of which the company formed a part, reporting that the company had shown a mutinous spirit and was in a demoralized condition, and requesting that it should be disbanded. The captain and members of the company who prosecuted the *certiorari* in that case claimed that the order had been made without notice to them, and without giving them an opportunity to contest the misconduct charged against the company. The court distinguished the case from those above cited on the ground that as express power to exercise the authority to disband had been given by legislation, which was held not to be obnoxious to any constitutional prohibition, the power to review an adjudication because of irregularities and deficiencies was not in a court of law, but the grievance of prosecutors, if any, was only remediable by appealing to the

higher military authorities. *Grove* v. *Mott,* 17 *Vroom* 328. A similar decision was lately made in that court. *In re Powers,* 37 *Id.* 571.

It is obvious that the Supreme Court has no general supervisory power over the militia of the state, and the acts and determinations of military officers, in many cases, are plainly not subject to review by it. Where the line is to be drawn separating the reviewable acts from those not reviewable, and on which side of the line the cases last cited ought to fall, need not be decided. The question presented is on which side falls the case now in hand. After careful consideration, I have reached the conclusion that the Supreme Court had jurisdiction to review the order of Major-General Wanser, and that the jurisdiction was properly invoked by the prosecutor.

The order directed certain officers to assemble at a specified time and place for the purpose of electing a brigadier-general of the First Brigade. The officers directed to assemble were the field officers of the First Brigade and the commanding officers of Battery A, field artillery, and the First Troop of Cavalry. By sections 14 and 15 of the act entitled "An act concerning the military and naval forces" [Revision of 1900], approved March 23d, 1900, the last two named officers were authorized to vote at such an election, and if the provisions of those sections in that respect were within the power of the legislature to enact, the order was unobjectionable.

But it is shown and conceded that prosecutor was a field officer of the First Brigade, and that the commanding officers of the battery and the troop of cavalry were only captains, and not field officers. By the provisions of placitum 4, section 1, article 7 of the constitution of this state it is declared that "brigadier-generals shall be elected by the field officers of their respective brigades." If this constitutional provision is applicable, the legislature had no power to confer authority to vote for the election of brigadier-generals on any other person than field officers of the brigade. So much of such legislation at least was therefore void, and the order complained of was not supported thereby. The division commander was without jurisdiction to make such an order.

If prosecutor's claim is well founded, it is plain that, as a field officer of the brigade, he has been clothed with the right and privilege of voting for a brigadier-general to command the brigade, in connection with the other field officers, or such of them as may attend under the order. If two persons who are not field officers are admitted to vote in the election of a brigadier-general, the right and privilege of the prosecutor is thereby contracted and diminished, for his vote may be negatived and overcome by the vote of one such person. The case is analogous to that considered in the Supreme Court in *State* v. *Wrightson,* 27 *Vroom* 126, in which citizens entitled to vote for members of the assembly were deemed competent to require the court to determine the constitutionality of the law which provided for the election of such members by districts, each district electing but one. The court held that if the act requiring the election by districts was in opposition to a constitutional mandate, citizens who were thereby deprived of the privilege of voting for all members apportioned to a county were so aggrieved as to justify them in applying for the extraordinary writ of *mandamus* to protect their privilege.

The writ was properly issued, and brought before the Supreme Court the order in question.

The sole point made in the argument presented to us in support of the second ground for reversal is thus stated in the brief of counsel:

"That the legislature intended that there should be two distinct military forces in this state is apparent, otherwise the legislature would not have legislated for two separate bodies. One (the militia) is recognized as a constitutional body, and will exist until the United States shall repeal its statutes with reference to militia, and the people of this state shall repeal article 7 of the constitution; the other (the national guard) is a statutory body, a mere creature of the legislature, which may be legislated out of existence at the pleasure of the legislature."

Counsel then point out certain manifest inconsistencies between the provisions of the act of 1900 and the provisions of

acts of congress enacted under the authority of the federal constitution.

The argument in support of this point is thus put: (1) The constitution of the United States, by section 8 of article 1, gives power to congress "to provide for calling forth the militia to execute the laws of the union, suppress insurrections and repel invasion; to provide for organizing, arming and disciplining the militia, and for governing such part of them as may be employed in the service of the United States, reserving to the states, respectively, the appointment of the officers and the authority of training the militia according to the discipline prescribed by congress;" (2) that congress has exercised the powers thus conferred upon it by acts, commencing with the act of May 8th, 1792, with various supplementary acts, now combined in the provisions of the revised statutes of the United States in sections 1625 to 1661, inclusive; (3) that, although prior to the adoption of the constitution of the United States, the states had plenary power to organize and govern its military force or militia, and the grant to congress in that respect detracts from the power of the states only so much as is conferred upon congress, and although if congress had not exercised the power granted, the legislatures of the states might still have acted thereon, yet after congress had exercised the power granted, the right of the states to enact laws inconsistent with the paramount and controlling provisions of the act of congress could not exist; and (4) that state laws inconsistent with the act of congress must be presumed as not intended to antagonize the latter, but rather to legislate upon matters not within the power of congress.

The contention is that the act of 1900, because, in respect to the national guard, inconsistent with the acts of congress on the subject of the militia, indicates a legislative intent to create an organized body of troops of that name, distinct from and not included with the militia of the state.

This contention cannot, in my judgment, prevail. The legislative intent in the passage of the act of 1900 is plainly disclosed. It was to legislate respecting the militia of the state.

The act of 1900 was the sequence of a series of legislative

acts. By the act entitled "An act establishing a militia system," passed February 15th, 1815 (*Rev.* 1821, *p.* 574), provision was made for the militia of the state, including what the act calls "uniform corps" and independent battalions, which, without going into unnecessary detail, were plainly intended to be part of the prescribed military system.

By the act of identical title, approved April 17th, 1846 (*R. S.* 1847, *p.* 745), which was passed after the adoption of the constitution of 1844, in which was contained the provision for the election of brigadier-generals by the field officers of the brigade, provision was made for the militia, including uniform corps or companies, which might be, on application, set off to form independent battalions, squadrons or regiments.

By the act entitled "An act for the more effectual organization of the militia," approved March 22d, 1860 (*Pamph. L., p.* 508), it was enacted that the militia should be divided into two classes, the active and the reserve; the active to consist of all persons liable to do military duty who then were, or might thereafter be, enrolled in any uniformed company, the reserve to include the residue of the militia of the state.

By the act of like title with the act last cited, approved April 6th, 1865 (*Pamph. L., p.* 856), a like division of the militia into two classes, the active and the reserve, was made.

By the act entitled "An act for the organization of the national guard of the State of New Jersey," approved March 9th, 1869 (*Pamph. L., p.* 251), it was enacted that the active militia of the state should be known as the national guard of the State of New Jersey. This act appears to repeal the former acts above referred to, and it is noticeable that it contains no provision respecting the reserve militia. It continued, however, in force, with immaterial amendments, until the passage of the act of 1900, now under review.

An examination of all these acts discloses a very plain legislative intent to deal with the militia system of the state by a division into two classes—one, uniformed and organized into companies and independent battalions or regiments and afterward designated as the active class of the militia, and the other composed of the remaining persons subject to military

duty. It is not necessary now to decide whether these acts were, in all their particulars, within the power of the legislature. But it cannot be doubted that the legislative intent was that above stated. The provisions of the act of congress now embraced in section 1630, to the effect that "the militia of each state shall be organized into divisions, brigades, regiments, battalions and companies, as the legislature of the state may direct," would seem to indicate that the state was not without power to organize divisions, brigades, regiments, battalions and companies out of one class of the militia, and like organizations out of another class. Color is, perhaps, given to such a construction by the permission given by section 1632 to form certain companies from volunteers.

The act of 1900 followed, and took the place of the series of acts above cited. That it discloses a legislative intent to deal with the whole militia system of the state, and not to create a distinct force under state authority, seems to me not open to doubt.

The use of the words "military and naval forces" in the title of the act, and of "military forces" in the body of the act, does not, in my judgment, militate against this conclusion. The words are an exact equivalent for the word "militia."

The act indicates the intent mentioned, by continuing the classification which pervaded the former acts, of active and reserve forces. It then repairs the omission of the act of 1869 by making express provision, by sections 156 to 163, inclusive, for what it calls the "reserve militia." The previous provisions were therefore designed for the militia from which there was a reserve.

The intent is further indicated by section 165, which provides that the act shall not terminate the commission, reduce the rank or vacate the office of any officer now in commission. The former system was not abrogated, but confirmed.

This conclusion is rendered irresistible by the fact that the act contains no provisions respecting the election of brigadier-generals excepting those contained in sections 14 and 15, declaring that the commissioned officers of the troop and battery may vote in such election. When the act of 1815, *ubi*

*supra,* was passed, the constitution of 1776 was in force, and that provided that brigadier-generals should be elected by the legislature. When the act of 1846, *ubi supra,* was passed, the constitution of 1844, providing for the election of brigadier-generals by the field officers, had been adopted, and that act, by section 22, provided how the field officers should be called together, and how such election should be held and its results be certified. The act of 1860, *ubi supra,* by section 7, provided how such election should be conducted, but did not state who should be called to meet and vote at such election. That was evidently deemed to be effectively prescribed by the constitution. The act of 1869, *ubi supra,* contains a similar provision, and it was no doubt deemed unnecessary to declare who should be notified to attend at such election, because the constitutional designation of the voters was sufficient. When the act of 1900, by section 22, provides for an election of brigadier-generals, and prescribes that the division commander shall give the notice, preside at the election and certify the result, and fails to declare to whom the notice shall be given, or that field officers could vote thereat, it is perfectly obvious that the voting by the field officers was deemed to be effectively prescribed by the constitution.

Having concluded that the legislature, in the act of 1900, has intended to deal with the militia of the state, it follows that its enactment must conform to the provisions of the constitution. Article 7 relates to the "appointing power and tenure of office." Its first section relates to militia officers. When, in placitum 4 of that section, it is prescribed that brigadier-generals shall be elected by the field officers of their brigades, the legislature was powerless to make a different rule for such election. By section 8 of article 1 of the constitution of the United States the appointment of military officers is expressly reserved to the states. A state may determine, in its constitution, how the appointment shall be made.

The result is that the provisions for the votes of the commanding officers of the troop and battery were beyond the power of the legislature.

If I•had become convinced that the legislature intended to create, by this act, a body of troops which were not militia, but state troops, which the legislature could legislate about at its pleasure, I should feel obliged to declare that the act in that respect was wholly lacking in validity, because prohibited by the constitution of the United States. By the provisions of article 1 congress is endowed with power to create an army and a navy. Under this provision the regular army is organized and maintained. Power is also conferred over the militia. These two forces, viz., the regular army and the militia, are thus recognized and distinguished. When, by section 10 of the same article, it is provided that "no state shall, without the consent of congress, * * * keep troops * * * in time of peace," it is obvious that every state is prohibited from organizing or maintaining any state force other than militia in time of peace, unless the consent of congress has been first obtained.

It results that the judgment below must be affirmed.

*For affirmance*—THE CHANCELLOR, VAN SYCKEL, DIXON, COLLINS, FORT, GARRETSON, HENDRICKSON, BOGERT, ADAMS, VREDENBURGH, VOORHEES.  11.

*For reversal*—None.